Patrick T. Perkins (PP 1694)
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, New York 10516
Tel: (845) 265-2820
Fax: (845) 265-2819

*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENSINGTON PUBLISHING CORP., ) | |
| ) | |
| Plaintiff, ) | Case No. 06 CV 4748 (JSR) |
| ) | |
| v. ) | **COMPLAINT** |
| ) | |
| HEATHER ARMSTRONG, ) | **ECF CASE** |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

Plaintiff Kensington Publishing Corp. ("Kensington"), by its undersigned attorney, for its Complaint against defendant Heather Armstrong ("Armstrong" or "Defendant") (Kensington and Armstrong collectively the "Parties"), alleges as follows:

## THE PARTIES

1.      Kensington is a New York corporation with a principal place of business at 850 Third Avenue, New York, New York.

2.      Upon information and belief, Armstrong is an individual residing in the state of Utah.

## JURISDICTION & VENUE

3.      The Court has diversity jurisdiction under Section 1332 of the Judicial Code, 28 U.S.C. § 1332, because the controversy is between citizens of different states and the matter in controversy exceeds the value of $75,000, exclusive of interest and costs.

4.      Venue is proper under Section 1391(b) and (c) of the Judicial Code, 28 U.S.C. § 1391(b), (c), because: (a) by contract, the Parties have a forum selection clause under which they agree to litigate any dispute in this Court; (b) a substantial portion of the events at issue have arisen and will arise in this judicial district; and (c) upon information and belief, Armstrong does business in and/or has substantial contacts with the Southern District of New York.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### Background

5.      Kensington, which has been in business for 32 years, is the last remaining independent U.S. publisher of hardcover, trade and mass market paperback books.  Kensington now accounts for 7% of all mass market paperback sales in the U.S.

6.      Armstrong owns and operates a web site located at the URL www.dooce.com (the "Site").  She is what is commonly known as a "blogger," which is a person who keeps a Web log or a personal diary on their web site.

7.      According to her Site, Armstrong began her "blog" in February 2001.  Armstrong states that her Site "chronicles my life from a time when I was single and making a lot of money as a web designer in Los Angeles, to when I was dating the man who would become my husband, to when I lost my job and lived life as an unemployed drunk, to when I married my husband and moved to Utah, to when I became pregnant, to when I threw up and became unbearably swollen during the pregnancy, to the birth, to the aftermath, to the postpartum depression that landed me in a mental hospital."

8.      Upon information and belief, the Site has become very successful and Armstrong has become well-known in both the blogger community and in the mainstream press.  For example, she was featured in an article about female bloggers in the January 2006 issue of *Glamour* magazine.

9.    In recent years, books authored by well-known bloggers have become quite popular and have sold well.  Kensington has been active in publishing books by bloggers.  For example, it has published books by popular bloggers "Maddox" and Tucker Max which books both have been on the *New York Times* Bestseller List.

10.    In an effort to expand its publication of popular blogger books, Kensington approached Armstrong about publishing a book that she would write.  In or around late November 2005, Armstrong agreed to a two-book deal with Kensington (the "Oral Agreement"). In reliance upon Armstrong's commitment to deliver two books, Kensington has expended resources to develop the project.  Specifically, Kensington had placed Armstrong's first book on its production schedule and began developing a marketing plan for the book, and began promoting Armstrong's book to its customers, namely wholesalers, retailers, and jobbers.

11.    Meanwhile, on December 14, 2005, a few short weeks after Armstrong and Kensington had entered into the Oral Agreement, Kensington sent a written agreement to Armstrong's literary agent, memorializing the terms to which Armstrong had agreed.

12.    In the ensuing months, Kensington and Armstrong's *two* representatives, began active negotiations of the terms to be included in the written agreement.  Kensington and Armstrong's representatives engaged in extensive written correspondence, conducted several telephone conferences, and exchanged a number of drafts of a written agreement.

13.    Finally, on April 26, 2006, the parties agreed on all of the terms in the written agreement (the "Final Agreement").  Specifically, on April 26, 2006, Armstrong's representative sent an e-mail to Kensington's General Counsel (the "Acceptance E-mail"), which stated, "[t]he final revision of the above-referenced contract looks good.  Please send signature copies of the revised agreement to Betsy Lerner at Dunow Carlson & Lerner.  Could you also please e-mail a final clean copy to me for my file?  Thanks so much. I can't believe we made it!"  Pursuant to

Armstrong's representative's request, Kensington's General Counsel sent execution copies on the same day she received the Acceptance E-Mail.

14.     The Acceptance E-mail demonstrates Armstrong's unquestioned intent to be bound by the terms of the Final Agreement.  Moreover, it is clear from the Acceptance E-mail that all of the terms of the agreement between Armstrong and Kensington had been agreed to and were memorialized in the Final Agreement.  In addition, nowhere in the Acceptance E-mail, or anywhere else, did either party state that the agreement between the parties would not be binding unless and until the Final Agreement was signed.

15.     On or around May 21, 2006, Armstrong's representative called Kensington to inform it that Armstrong would not sign the Final Agreement.  The stated reason for this was that the Kensington editor who had originally approached Armstrong (the "Former Editor") and who had convinced her to sign with Kensington had left Kensington's employ.

16.     On May 22, 2006, Armstrong's representative spoke with Kensington's General Counsel and repeated the same rationale for Armstrong's decision not to sign the Final Agreement.

17.     On May 23, 2006, Kensington's General Counsel had a second conversation with Armstrong's representative, suggesting that the new editor assigned by Kensington to Armstrong's project speak directly with Armstrong.  Armstrong's representative agreed to this but stated that Armstrong was upset about the time it had taken for the contract to be finalized. She also stated that it would have been helpful if Kensington had called Armstrong immediately upon the Former Editor's departure.

18.     On May 24, 2006, the new editor assigned by Kensington to the Armstrong book project also called Armstrong in an effort to make her feel comfortable with the new working relationship.  During this conversation, Armstrong stated that she did not feel right signing the Final Agreement because she felt there was a lack of support from Kensington during the

contract negotiation process.  In support of this assertion, she pointed to the fact that, since the Oral Agreement was made in November 2005, she had heard from the Former Editor only one time.  She also stated that she did not receive a call from the Former Editor when he left Kensington, but only received an e-mail from him.

19.     On May 24, 2006, two of Kensington's senior executives called Armstrong to discuss the situation.  During this conversation, Armstrong stated that she was refusing to sign the Final Agreement because it took seven months to agree to a contract (a statement that was untrue), and that during that time, no one had contacted her and that this lack of contact was "nerve-racking."  Armstrong *did not* mention the departure of the Former Editor as a reason for her refusal to sign the Final Agreement.

20.     Pursuant to the Final Agreement, Armstrong is required to deliver the first 100 pages of the manuscript for the first book no later than July 1, 2006 and is required to deliver the completed manuscript no later than March 1, 2007.

21.     Upon information and belief, Armstrong has received interest from a different publisher with whom she intends to enter into a new publishing deal.

## FIRST CLAIM FOR RELIEF

### DECLARATORY JUDGMENT
### WITH RESPECT TO THE FINAL AGREEMENT

22.     Plaintiffs incorporate by reference paragraphs 1 through 21 as if fully set forth herein.

23.     A valid and binding contract exists between the Parties, who have agreed to be bound by the terms of the Final Agreement.  An actual controversy has arisen and exists between Kensington and Armstrong as to whether or not the Final Agreement is binding upon Armstrong.

24.     Kensington contends that Final Agreement is binding upon the Parties.  Upon information and belief, Armstrong disputes Kensington's contention and appears to contend that

she is not bound by the Final Agreement and that she is permitted to publish her book with another publisher.

25.     Kensington has substantially complied with its obligations under the valid contract with Armstrong.  Upon information and belief, Armstrong is able to perform her duties under the Final Agreement and Kensington has no adequate remedy at law.

26.     Kensington desires a judicial determination of its rights and a declaration that the Final Agreement is binding, that Armstrong is required to abide by its terms, including but not limited to, timely delivering a manuscript, and that Armstrong, her employees, agents, licensees, attorneys, successors, affiliates, subsidiaries and assigns, and all those in active concert and participation with any of them, including any entities controlled in whole or in part by her is/are prohibited from publishing any books written in whole or in part by Armstrong with any publisher other than Kensington.

27.     A judicial declaration is necessary and appropriate at this time in order that the parties might ascertain their respective rights as to the issues set forth in this claim for relief.

## SECOND CLAIM FOR RELIEF
## BREACH OF CONTRACT

28.     Kensington incorporates by reference paragraphs 1 through 27 as if fully set forth herein.

29.     There is a valid and binding contract between the Parties.

30.     Among her obligations under such contract, Armstrong was required to sign the Final Agreement and to deliver two manuscripts to Kensington for publication.

31.     Upon information and belief, Armstrong has no intention of signing the Final Agreement or of abiding by its terms.

32.     Kensington has substantially complied with its obligations under the Final Agreement.  Upon information and belief, Armstrong is able to perform her duties under the

Final Agreement. Armstrong's services to be provided under the Final Agreement are unique and Kensington has no adequate remedy at law.

33.     As a result of the breach of contract by Armstrong, Kensington will suffer irreparable harm.

34.     In the alternative, as a result of Armstrong's breach, Kensington has suffered and will suffer actual and consequential damages.

## THIRD CLAIM FOR RELIEF

### BREACH OF THE IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING

35.     Kensington incorporates by reference paragraphs 1 through 34 as if fully set forth herein.

36.     There is a binding contract between the Parties.

37.     Armstrong's above-explained conduct, including but not limited to her actual and expected breach of the Final Agreement, constitutes a breach of the implied covenant of good faith and fair dealing.

38.     Kensington has substantially complied with its obligations under the Final Agreement. Upon information and belief, Armstrong is able to perform her duties under the Final Agreement. Armstrong's services to be provided under the Final Agreement are unique and Kensington has no adequate remedy at law.

39.     As a result of the breach by Armstrong, Kensington will suffer irreparable harm.

40.     In the alternative, as a result of Armstrong's breach, Kensington has suffered and will suffer actual and consequential damages.

## FOURTH CLAIM FOR RELIEF
### PROMISSORY ESTOPPEL

41.     Plaintiffs incorporate by reference paragraphs 1 through 40 as if fully set forth herein.

42.     Armstrong has promised to execute and abide by the terms of the Final Agreement.

43.     Kensington has relied on such promise and has been and will be injured by such reliance in the event Armstrong does not live up to her promises.

44.     If Armstrong's promise is not enforced, an injustice will occur to Kensington's detriment.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that judgment be entered against Defendant as follows:

1.     An order declaring that there is a valid contract between the parties and that the Final Agreement represents the terms to which the parties have agreed.

2.     That specific performance of the Final Agreement be awarded and that Defendant be ordered to perform her obligations set out in the Final Agreement.

3.     An order preliminarily and permanently enjoining Defendant, her employees, agents, licensees, attorneys, successors, affiliates, subsidiaries and assigns, and all those in active concert and participation with any of them, including any entities controlled in whole or in part by the Defendant, from publishing any books written in whole or in part by Armstrong with any publisher other than Kensington.

4.     In the alternative, an award of monetary relief, including but not limited to: (a) actual damages; (b) consequential damages; (c) special damages; and (d) punitive damages.

5.     An award of Plaintiff's costs in this civil action, including reasonable attorneys' fees and expenses; and

6.      Granting to Plaintiff such other and further relief as the Court may deem just and proper.

Dated: June 19, 2006

                                        PERKINS LAW OFFICE, P.C.

                                    By: _____
                                        Patrick T. Perkins (PP 1694)
                                        1711 Route 9D
                                        Cold Spring, New York 10516
                                        Tel: (845) 265-2820
                                        Fax: (845) 265-2819