Patrick T. Perkins (PP 1694)
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, New York 10516
Tel: (845) 265-2820
Fax: (845) 265-2819

*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENSINGTON PUBLISHING CORP.,      )<br>         )<br>Plaintiff,      )<br>         )<br>v.      )<br>         )<br>HEATHER ARMSTRONG,      )<br>         )<br>Defendant.      )<br>         )<br>_____ ) | Case No. 06 CV 4748 (JSR)<br><br>**ECF CASE**<br>**FILED ELECTRONICALLY** |

## PLAINTIFF'S MEMORANDUM OF LAW

## IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................

PRELIMINARY STATEMENT ........................................................................ 1

FACTS ........................................................................................................... 2

I.   LEGAL STANDARDS FOR A MOTION TO DISMISS.................................. 5

II.  DEFENDANT'S ARGUMENT THAT SECTION 204 OF THE COPYRIGHT ACT
     BARS PLAINTIFF'S CLAIMS IS WITHOUT MERIT...................................... 5

   A. DEFENDANT PROVIDES NO EXPLANATION AS TO *WHY* SECTION 204(A) APPLIES IN THIS
      CASE.......................................................................................................... 6

   B. THE FINAL AGREEMENT REQUIRES DEFENDANT TO SIGN ANY DOCUMENTS TO EFFECTUATE
      ITS PURPOSES............................................................................................ 6

   C. UNDER THE FEDERAL "E-SIGN" STATUTE, DEFENDANT'S AGENT'S ACCEPTANCE E-MAIL
      SATISFIES THE REQUIREMENTS OF SECTION 204(A) OF THE COPYRIGHT ACT..................... 7

   D. DEFENDANT'S COPYRIGHT ARGUMENT ALSO FAILS BECAUSE AN IMPLIED LICENSE ALSO
      EXISTS. ...................................................................................................... 8

      1. Because The Allegedly Unenforceable Provision Is Severable From The Remainder Of
         The Final Agreement Constitutes A Non-Exclusive License............................ 8

      2. The Oral Agreement Also Gives Rise To A Non-Exclusive License ............... 10

III. DEFENDANT'S RELIANCE UPON THE STATUTE OF FRAUDS TO ESCAPE HER
     OBLIGATIONS UNDER THE FINAL AGREEMENT IS MISPLACED. ...................... 10

   A. BECAUSE THE FINAL AGREEMENT AND THE ACCEPTANCE E-MAIL ARE WRITTEN
      AGREEMENTS, THE STATUTE OF FRAUDS DOES NOT APPLY................................. 11

      1. Defendant's Attempt To Establish That The Parties Did Not Intend To Be Bound Until
         A Final Agreement Was Executed Calls For A Finding Of Fact Inappropriate At This
         Stage Of The Case ................................................................................... 11

      2. Defendant's Attempt To Claim That The Agreement Upon Which She Relies Consists
         Solely Of The Acceptance E-mail Is Both Disingenuous And Incorrect. ........... 14

IV.  DEFENDANT'S CLAIM THAT PLAINTIFF IS NOT ENTITLED TO SPECIFIC
     PERFORMANCE IS INCORRECT................................................................ 15

V.    DEFENDANT CANNOT ESTABLISH AT THIS STAGE THAT PLAINTIFF WILL
        NOT BE ENTITLED TO ATTORNEYS' FEES. ............................................................ 16

VI.   PLAINTIFF MAY BE ENTITLED TO PUNITIVE DAMAGES ..................................... 17

## TABLE OF AUTHORITIES

### CASES

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S. Ct. 1612, 44 L. Ed. 2d 141
    (1975).............................................................................................................................. 20

*American Broadcasting Cos. v. Wolf*, 52 N.Y.2d 394, 402, 438 N.Y.S.2d 482 (1981) .............. 20

*Apple Corps v. Sony Music Entertainment*, 1993 U.S. Dist. LEXIS 9512 (S.D.N.Y. July 14,
    1993).......................................................................................................................... 15, 17

*Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69 (2d Cir. 1989) ................................ 15

*Bazak Int'l Corp. v. Tarrant Apparel Group*, 378 F. Supp. 2d 377, 386 (S.D.N.Y. 2005)........... 11

*BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 712 N.E.2d 1220, 690 N.Y.S.2d 854
    (N.Y. 1999)..................................................................................................................... 12

*Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573 (2d Cir.
    2006)................................................................................................................................ 13

*Branham v. Meachum*, 77 F.3d 626 (2d Cir. 1996) ...................................................................... 9

*Carano v. Vina Concha y Toro, S.A.*, 288 F. Supp. 2d 397 (S.D.N.Y. 2003).............................. 13

*Career Initiatives Corp. v. Palmer,* 893 F. Supp. 295 (S.D.N.Y. 1995) ..................................... 21

*Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998) ..................................................................... 9

*Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49 (2d Cir. 1993) …….11, 15, 19

*Conley v. Gibson*, 355 U.S. 41, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957) ............................................. 9

*Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568 (2d Cir. 1993) ................. 14, 15, 18

*Crabtree v. Elizabeth Arden Sales Corp.*, N.Y. 48 (1953) .......................................................... 15

*Deutsche Asset Mgmt. v. Callaghan*, 2004 U.S. Dist. LEXIS 5945

(S.D.N.Y. April 7, 2004) ................................................................................................ 14, 15

*Farago Adver., Inc. v. Hollinger Int'l, Inc.*, 157 F. Supp.2d 252 (S.D.N.Y. 2001)...................... 17

*Ferro v. Bologna,* 31 N.Y.2d 30, 286 N.E.2d 244, 334 N.Y.S.2d 856 (N.Y. 1972) ................... 13

*Gordon v. Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427, 334 N.Y.S.2d 601,

285 N.E.2d 849 (1972) ................................................................................................ 21

*Graham v. James*, 144 F.3d 229 (2d Cir. 1998) ................................................................ 13

*Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749 (11th Cir. 1997)..................................... 13

*Kerin v. U.S. Postal Serv.*, 218 F.3d 185 (2d Cir. 1990) ..................................................... 20

*Korea Life Ins. Co. v. Morgan Guar. Trust Co. of N.Y.*, 269 F. Supp.2d 424 (S.D.N.Y. 2003) .. 15

*Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc.*, 128 F.3d 872 (5th Cir. 1997)................. 13

*Mister Softee, Inc. v. Marerro*, 2004 U.S. Dist. LEXIS 20989 (S.D.N.Y. October 21, 2004) ....... 9

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, Inc.*, 392 F.3d 520 (2d Cir. 2004)........................ 21

*Scheck v. Francis*, 26 N.Y.2d 466, 311 N.Y.S.2d 841, 843 (1970)............................................. 16

*Scheuer v. Rhodes*, 416 U.S. 232, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974) ................................... 9

*Shubert Theatrical Co. v. Rath*, 271 F. 827, 830 (2d Cir. 1921) ................................................. 20

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002).............. 9, 11

*Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383 (2d Cir. 2005) .... 21

*Triggs v. Triggs*, 46 N.Y.2d 305, 385 N.E.2d 1254, 413 N.Y.S.2d 325 (N.Y. 1978) ................. 12

*Westchester Fire In. co. v. Massamont Ins. Agency, Inc.*, 420 F. Supp.2d 223

(S.D.N.Y. 2005)......................................................................................................... 20

**STATUTES**

15 U.S.C. § 7001 *et seq.*....................................................................................... 11, 12

17 U.S.C. § 204(a) ................................................................................................... *passim*

17 U.S.C. § 301 ................................................................................................ 10

N.Y. Gen. Oblig. Law § 5-701 ....................................................................... 14

**RULES**

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 9

**TREATISES**

Melville & David Nimmer, *Nimmer on Copyright* ....................................... 13

Plaintiff Kensington Publishing Corp. ("Kensington") respectfully submits this memorandum in opposition to Defendant Heather Armstrong's ("Defendant" or "Armstrong") Motion To Dismiss Plaintiff's Complaint (the "Motion").

## PRELIMINARY STATEMENT

This is a case about Defendant's broken promises and her attempt to escape from a written agreement, the terms of which she agreed to through her authorized representative. Defendant seeks now to dismiss the complaint based upon her unilateral view of the parties' intentions – an inherently factual issue inappropriate for determination on this Motion.  For the reasons set forth below, Defendant's Motion should be denied.

## FACTS

**The Parties**

Kensington, which has been in business for 32 years, is the last remaining independent U.S. publisher of hardcover, trade and mass market paperback books.  Kensington now accounts for 7% of all mass market paperback sales in the U.S.  (Cmplt. ¶ 5.)

Armstrong owns and operates a web site located at the URL www.dooce.com (the "Site").  She is what is commonly known as a "blogger," which is a person who keeps a Web log or a personal diary on their web site.  (*Id*. ¶ 6.)  According to her Site, Armstrong began her "blog" in February 2001.  Armstrong states that her Site "chronicles my life from a time when I was single and making a lot of money as a web designer in Los Angeles, to when I was dating the man who would become my husband, to when I lost my job and lived life as an unemployed drunk, to when I married my husband and moved to Utah, to when I became pregnant, to when I threw up and became unbearably swollen during the pregnancy, to the birth, to the aftermath, to the postpartum depression that landed me in a mental hospital." (*Id.* ¶ 7.)  The Site has become very successful and Armstrong has become well-known in both the blogger community and in the mainstream press.  For example, she was featured in an article about female bloggers in the January 2006 issue of *Glamour* magazine.  (*Id*. ¶ 8.)

In recent years, books authored by well-known bloggers have become quite popular and have sold well.  Kensington has been active in publishing books by bloggers.  For example, it has

published books by popular bloggers "Maddox" and Tucker Max which books both have been on the *New York Times* Bestseller List.  (*Id*. ¶ 9.)

**The Oral Agreement**

In an effort to expand its publication of popular blogger books, Kensington approached Armstrong about publishing a book that she would write.  In or around late November 2005, Armstrong agreed to a two-book deal with Kensington (the "Oral Agreement").  In reliance upon Armstrong's commitment to deliver two books, Kensington has expended resources to develop the project.  Specifically, Kensington had placed Armstrong's first book on its production schedule, began developing a marketing plan for the book, and began promoting Armstrong's book to its customers, namely wholesalers, retailers, and jobbers.  (*Id*. ¶ 10.)

Meanwhile, on December 14, 2005, a few short weeks after Armstrong and Kensington had entered into the Oral Agreement, Kensington sent a written agreement to Armstrong's literary agent, memorializing the terms to which Armstrong had agreed.  In the ensuing months, Kensington and Armstrong's *two* representatives began active negotiations of the terms to be included in the written agreement.  Kensington and Armstrong's representatives engaged in extensive written correspondence, conducted several telephone conferences, and exchanged a number of drafts of a written agreement.  (*Id*. ¶¶ 11-12.)

**The Written Agreement**

Finally, on April 26, 2006, the parties agreed on all of the terms in the written agreement (the "Final Agreement").  Specifically, on April 26, 2006, Armstrong's representative sent an e-mail to Kensington's General Counsel (the "Acceptance E-mail") (the Oral Agreement, the Final Agreement, and the Acceptance E-mail are together referred to as the "Agreements"), which stated, "[t]he final revision of the above-referenced contract looks good.  Please send signature copies of the revised agreement to Betsy Lerner at Dunow Carlson & Lerner.  Could you also please e-mail a final clean copy to me for my file?  Thanks so much. I can't believe we made it!"  Pursuant to Armstrong's representative's request, Kensington's General Counsel sent execution copies on the same day she received the Acceptance E-Mail.  (*Id*. ¶ 13.)

**Defendant's Attempt To Break The Agreements**

On or around May 21, 2006, Armstrong's representative called Kensington to inform it that Armstrong would not sign the Final Agreement.  The stated reason for this was that the Kensington editor who had originally approached Armstrong (the "Former Editor") and who had convinced her to sign with Kensington had left Kensington's employ.  (*Id.* ¶ 15.)

On May 22, 2006, Armstrong's representative spoke with Kensington's General Counsel and repeated the same rationale for Armstrong's decision not to sign the Final Agreement.  On May 23, 2006, Kensington's General Counsel had a second conversation with Armstrong's representative, suggesting that the new editor assigned by Kensington to Armstrong's project speak directly with Armstrong.  Armstrong's representative agreed to this but stated a new pretext for her client's attempt to break the Agreements.  Namely, she now claimed that Armstrong was upset about the time it had taken for the contract to be finalized and that it would have been helpful if Kensington had called Armstrong immediately upon the Former Editor's departure.  (*Id.* ¶ 16-17.)

On May 24, 2006, the new editor assigned by Kensington to the Armstrong book project also called Armstrong in an effort to make her feel comfortable with the new working relationship.  During this conversation, Armstrong asserted yet another pretext for attempting to break the Agreements.  Namely, she stated that she did not feel right signing the Final Agreement because she felt there was a lack of support from Kensington during the contract negotiation process.  In support of this assertion, she pointed to the fact that, since the Oral Agreement was made in November 2005, she had heard from the Former Editor only one time.  She also stated that she did not receive a call from the Former Editor when he left Kensington, but only received an e-mail from him.  (*Id.* ¶ 18.)

On May 24, 2006, two of Kensington's senior executives called Armstrong to discuss the situation.  During this conversation, Armstrong stated that she was refusing to sign the Final Agreement because it took seven months to agree to a contract (a statement that was untrue), and that during that time, no one had contacted her and that this lack of contact was "nerve-racking." Armstrong *did not* mention the departure of the Former Editor as a reason for her refusal to sign the Final Agreement.  (*Id.* ¶ 19.)

3

In none of these discussions did either Defendant or her representatives state that there were any terms in the Final Agreement to which they had not agreed.  Rather, upon information and belief, Defendant's stated reasons for attempting to break the Agreements are pretextual. Kensington believes the Defendant has been approached by the publishing house for which the Former Editor works, to deliver the books to which Kensington is entitled.  (Cmplt. ¶ 21.)

**This Action**

When negotiations to settle the matter amicably failed, Kensington filed the instant action on June 20, 2006.  In its complaint Kensington asserts causes of action for: (1) Declaratory Judgment; (2) Breach of Contract; (3) Breach of the Implied Covenant of Good Faith and Fair Dealing; and (4) Promissory Estoppel.

**SUMMARY OF ARGUMENT**

Defendant seeks to dismiss the Complaint primarily on two grounds.  First, she claims that because the Agreements are not signed, there is no enforceable assignment of copyright pursuant to Section 204(a) of the Copyright Act and, as a result, the Agreements are not enforceable.  Second, Defendant claims that the Agreements are unenforceable under New York's Statute of Frauds.  Both arguments are without merit.

The copyright argument fails for a number of reasons.  First, the argument is irrelevant. This is not a case for declaration of copyright ownership.  Second, the Final Agreement, by its terms, requires Defendant to execute any documents necessary to effectuate its purposes.  Such would include an assignment of copyright.  Third, pursuant to the "E-Sign" Act, 15 U.S.C. § 7001 *et seq.*, the Acceptance E-Mail, combined with the Final Agreement, constitutes a valid and enforceable signed transfer.  Fourth, even if the Final Agreement does not require Defendant to execute a copyright assignment and the Acceptance E-mail and the Final Agreement do not constitute a valid copyright assignment, under New York Law, any unenforceable contractual provision is severable.  As a result, even if no exclusive grant exists, an implied and non-exclusive license is granted under the Final Agreement.  Similarly, the Oral Agreement also constitutes a non-exclusive license.

Defendant's reliance upon the Statute of Frauds is similarly unavailing.  Defendant's argument hinges upon her assertion that the parties did not intend to be bound until the Final

4

Agreement was fully executed.  However, because this issue goes to the intention of the parties, it is unquestionably an issue of fact not properly resolved on this Motion.

Defendant also argues, in the alternative, that Plaintiff's application for specific performance, attorneys' fees, and punitive damages, should be stricken.  However, Defendant's arguments rely entirely upon either erroneous or incomplete applications of the law.

In sum, for the reasons set forth below, the Motion should be denied.

## I.      LEGAL STANDARDS FOR A MOTION TO DISMISS.

In ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See, e.g., Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)."  *Mister Softee, Inc. v. Marerro*, 2004 U.S. Dist. LEXIS 20989, * 4-5 (S.D.N.Y. October 21, 2004).  Moreover, a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).

"At the [Rule] 12(b)(6) stage, 'the issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.  Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.'"  *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998) (quoting *Branham v. Meachum*, 77 F.3d 626, 628 (2d Cir. 1996))."  *Mister Softee, Inc.*, 2004 U.S. Dist LEXIS 20989, *5.

Defendant's Motion does not meet this high standard.

## II.     DEFENDANT'S ARGUMENT THAT SECTION 204 OF THE COPYRIGHT ACT BARS PLAINTIFF'S CLAIMS IS WITHOUT MERIT.

Section 204(a) of the Copyright Act provides in relevant part:

> A transfer of copyright ownership, other than by operation of law, is not valid unless instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

17 U.S.C. § 204(a).  Defendant argues that Plaintiff's complaint should be dismissed because, according to her, none of the Agreements constitute the written assignment of copyright required under Section 204(a) of the Copyright Act.  For the reasons set forth below, Defendant's argument is without merit.

### A. Defendant Provides No Explanation As To *Why* Section 204(a) Applies In This Case.

In her brief, Defendant sets forth a six-page exegesis concerning Section 204(a) to establish the unremarkable proposition that the Copyright Act requires that a transfer in ownership of copyright occurs solely through a writing signed by the copyright owner or his or her duly authorized agent.  (Def. Mem. at 5-11.)  However, Defendant fails to explain what relevance this has to the instant case.  That is because there is none.

This case is *not* one for a declaration of copyright ownership – it is a case, *inter alia*, for a declaration that the Final Agreement is enforceable and that Defendant has breached such Agreement.  (*See* Complaint.)  Defendant fails to explain why, if there is no assignment of copyright, the Final Agreement is unenforceable.  Indeed, Defendant tacitly admits the inapplicability of the Copyright Act by the arguments she *does not* make.  Specifically, if this case were a copyright case dressed up as a contract action, Defendant undoubtedly would have claimed that Kensington's claims are preempted under Section 301 of the Copyright Act.  17 U.S.C. § 301.  Defendant has not so argued.

### B. The Final Agreement Requires Defendant To Sign Any Documents To Effectuate Its Purposes.

Paragraph 27 of the Final Agreement provides as follows:

> The Publisher and the Author and each of them agree that they will execute and deliver to each other at any time all and any documents reasonably necessary to fulfill the terms of this Agreement including but not limited to application to secure copyright upon the Work.

Lerner Ex. A at 20, ¶ 27.

Even if a written assignment of copyright is required to make the Final Agreement enforceable, which it is not, the above paragraph *requires* the Defendant to "execute and deliver"

any documents necessary to fulfill the Agreement's terms.  Moreover, the paragraph *expressly references* documents to *"secure copyright upon the work*."  (*Id.*, emphasis added.)

The above-referenced provision in the Final Agreement does not constitute an "agreement to agree."  Rather, it is a clear and unambiguous contractual obligation.  Because the Final Agreement is enforceable, Defendant is required to abide by its terms, including paragraph 27.  This undisputed fact, which must be viewed in the light most favorable to the Plaintiff, defeats Defendant's copyright argument on this separate ground.  *Swierkiewicz*, 534 U.S. at 508 n.1.

**C.     Under The Federal "E-Sign" Statute, Defendant's Agent's Acceptance E-Mail Satisfies The Requirements Of Section 204(a) Of The Copyright Act.**

The federal E-Sign Act provides, in relevant part:

Notwithstanding any statute, regulation, or other rule of law…with respect to any transaction in or affecting interstate or foreign commerce—

> (1)  a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability because it is in electronic form; and

> (2) a contract relating to such transaction may not be denied legal effect, validity, or enforceability solely because an electronic signature or electronic record was used in its formation.

15 U.S.C. § 7001(1) and (2).

The statute defines an electronic signature as "an electronic sound, symbol, or process, attached to *or logically associated with* a contract or other record and executed or adopted by a person with the intent to sign the record."  15 U.S.C. § 7006 (5).  (Emphasis added.)  *See also Bazak Int'l Corp. v. Tarrant Apparel Group*, 378 F. Supp. 2d 377, 386 (S.D.N.Y. 2005) (motion for summary judgment to deny breach of contract claim denied, in part, due to validity of confirmatory e-mail pursuant to 15 U.S.C. § 7001 *et seq.*)  This statute is fully consistent with the law of New York and of this Circuit that, when evaluating whether a series of writings constitute an enforceable contract, "they must interpreted together."  *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 52-53 (2d Cir. 1993).

There can be no dispute that the combination of the Acceptance E-mail and the Final Agreement meet the standards set forth by the E-Sign Act and constitute a valid copyright transfer pursuant to section 204(a) of the Copyright Act.

First, the transaction between Kensington and the Defendant is one "in or affecting interstate or foreign commerce."  15 U.S.C. § 7001.  (*See, e.g.*, Cmplt ¶¶ 1-2, parties residing in different states.)  Second, the Acceptance E-mail contains an "electronic signature" from Defendant's representative[1] that it is "logically associated" with the Final Agreement as it states:

> [t]he *final* revision of the above-referenced contract looks good.  Please send *signature copies* of the revised agreement to Betsy Lerner at Dunow Carlson & Lerner.  Could you please e-mail *a final clean copy to me for my file*?  Thanks so much.  *I can't believe we made it!*

(Cmplt. ¶ 13.)  (Emphasis Added.).  Indeed, when read together with the Final Agreement's grant of rights set forth at paragraph 1, (Lerner Ex. A at 1), which it must be both pursuant to the E-Sign Act and pursuant to the laws of this State and Circuit, the Acceptance E-mail constitutes "an instrument of conveyance, or a note or memorandum of the transfer…in writing and signed…by [the copyright] owner's duly authorized agent."  17 U.S.C. § 204(a).

**D.    Defendant's Copyright Argument Also Fails Because An Implied License Also Exists.**

**1.    Because The Allegedly Unenforceable Provision Is Severable From The Remainder Of The Final Agreement Constitutes A Non-Exclusive License.**

Where part of a contract is unenforceable,

> a court may nevertheless enforce the remainder of the contract. *See BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 712 N.E.2d 1220, 690

---

[1] Defendant makes the bizarre argument that Plaintiff's pleading is defective because it does not allege that Defendant's representative "had the capacity to act as Ms. Armstrong's agent or the authority to bind Ms. Armstrong…."  (Def.'s Mem. at 15.)  In fact, Plaintiff alleges that the Acceptance E-mail – sent by Defendant's representative – "demonstrates Armstrong's unquestioned intent to be bound by the terms of the Final Agreement."  (Cmplt. ¶ 14.)  Obviously the only logical inference (which inference must viewed in the light most favorable to plaintiff) from Plaintiff's pleading allegation, as well as Plaintiff's reference to the sender of the Acceptance E-mail as Defendant's "representative," meets the pleading standard set out in Fed. R. Civ. P. 8.  At very least, the question of whether Defendant's representative that sent the Acceptance E-mail had the authority to bind Defendant is a question of fact not appropriately decided on this motion.

N.Y.S.2d 854 (N.Y. 1999) (enforcing portions of a restrictive covenant where another portion of the covenant was overbroad and unenforceable as contrary to public policy); *Triggs v. Triggs*, 46 N.Y.2d 305, 385 N.E.2d 1254, 413 N.Y.S.2d 325 (N.Y. 1978) (enforcing legal provisions of a corporate shareholder agreement containing illegal provisions); *Ferro v. Bologna*, 31 N.Y.2d 30, 286 N.E.2d 244, 334 N.Y.S.2d 856 (N.Y. 1972) (holding that a provision of a separation agreement that was of questionable legality did not vitiate the entire agreement and the other provisions of the agreement may be valid and enforceable)…..

*Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 581 (2d Cir. 2006).  In the copyright context, this results in an unenforceable exclusive license being converted into a non-exclusive license.  *Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc.*, 128 F.3d 872, 880 (5th Cir. 1997) (unenforceable exclusive grant severed from remainder of contract and implied license held to exist); *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 752 (11th Cir. 1997) (holding non-exclusive license in place notwithstanding unenforceable exclusive grant).

While a writing is required to grant an exclusive license, no such requirement exists for non-exclusive licenses.  *See, e.g., Carano v. Vina Concha y Toro, S.A.*, 288 F. Supp. 2d 397, 402 (S.D.N.Y. 2003); 3-10 Melville & David Nimmer, *Nimmer on Copyright* § 10.03.  In this Circuit, "an implied non-exclusive license is granted when a person, the licensee, requests the creation of a work, the creator, the licensor, makes that particular work and delivers it to the licensee with the understanding that the licensee will copy and distribute the work."  *Carano*, 288 F. Supp. 2d at 402.  *See also Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998).

In this case, the allegations in the Complaint establish that (1) Kensington requested the works at issue; (2) Defendant would deliver them upon completion; and (3) such delivery would be with the understanding that Kensington would copy and distribute the work.  Thus, even if the Court finds that Defendant is not contractually required to execute an assignment of copyright or that no such assignment is in place, which it should not, the Final Agreement nonetheless would grant a non-exclusive license to Kensington, thus defeating Defendant's copyright argument on this separate basis.[2]

---

[2] That the Final Agreement contemplates an exclusive license does not preclude the possibility of the license becoming non-exclusive.  *See Lulirama*, 128 F.3d at 880; *Veeck*, 110 F3d at 752-753.

### 2. The Oral Agreement Also Gives Rise To A Non-Exclusive License

In or around late November 2005, Armstrong agreed to a two-book deal with Kensington (the "Oral Agreement"). (Cmplt. ¶ 6.) For the same reasons as those set forth in Section I.D.1 *supra*, the Oral Agreement also gives rise to an enforceable non-exclusive license.

## III. DEFENDANT'S RELIANCE UPON THE STATUTE OF FRAUDS TO ESCAPE HER OBLIGATIONS UNDER THE FINAL AGREEMENT IS MISPLACED.

In order for a valid contract to exist, there must be: (1) an offer, (2) an acceptance, and (3) consideration. *See, e.g., Deutsche Asset Mgmt. v. Callaghan*, 2004 U.S. Dist. LEXIS 5945, *47 (S.D.N.Y. April 7, 2004). Nowhere in her Motion does Defendant dispute that any of these elements is missing from the Agreements entered into between the parties. Instead, Defendant attempts to excuse her reneging on the Final Agreement by relying upon the Statute of Frauds under New York law. Section 5-701 of the New York General Obligations Law provides that agreements not in writing that cannot be completed within one year are unenforceable. N.Y. Gen. Oblig. Law § 5-701.

Recognizing that, if enforceable, the Final Agreement is a written agreement which would make the Statute of Frauds inapplicable, Defendant urges this Court to decide facts that bear on the central issue in this case, namely, whether the parties intended to be bound by the terms of the Final Agreement. Defendant advances two rationales for her defense: first, Defendant seeks to convince the Court that the parties did not intend to be bound until the Final Agreement was executed (Def. Mem. at 12-13), undisputedly an issue of fact not properly decided on this Motion. Second, Defendant takes aim at the Acceptance E-mail as an insufficient writing to establish the terms of the parties' agreement. This disingenuous argument ignores the well-established law in this State and in this Circuit that multiple documents can and should be read *together* in order to determine whether a binding agreement is in place. The Acceptance E-mail and the Final Agreement, read together, set forth with great particularity the terms to which the Defendant unquestionably agreed.

Because the Final Agreement constitutes an enforceable written agreement, the Statute of Frauds does not apply.

**A.      Because The Final Agreement And The Acceptance E-mail Are Written Agreements, The Statute Of Frauds Does Not Apply.**

A written contract can be formed from more than one writing, including letters or memoranda signed by only one party or unsigned by only one party *or unsigned by either party*. *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572-573 (2d Cir. 1993). *See also Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72-73 (2d Cir. 1989); *Korea Life Ins. Co. v. Morgan Guar. Trust Co. of N.Y.*, 269 F. Supp.2d 424, 445 (S.D.N.Y. 2003) (writings bearing signature of one *or neither* party may constitute a written contract); *Deutsche Asset Mgmt.* 2004 U.S. Dist. LEXIS 5945, *48; *Crabtree v. Elizabeth Arden Sales Corp.*, N.Y. 48, 53-55 (1953).

When attempting to determine whether a collection of writings constitutes a binding agreement, the Court is to look at all of the documents together.  *Commander Oil Corp.*, 991 F.2d at 52-53.

In this case, Plaintiff has alleged that the Acceptance E-mail and the Final Agreement, together, form a valid, enforceable Agreement.  Contrary to Defendant's characterization, it is clear that when read together (as they must be), the Acceptance E-mail and the Final Agreement establish: (1) an agreement to all material terms and an intention to be bound by them, and (2) the detailed terms of the agreement between the parties.

**1.      Defendant's Attempt To Establish That The Parties Did Not Intend To Be Bound Until A Final Agreement Was Executed Calls For A Finding Of Fact Inappropriate At This Stage Of The Case**

Central to the inquiry of whether a series of unsigned or partially signed writings can, together, constitute an enforceable agreement is whether the parties did not intend to be bound absent a signed, formal contract.  *See, e.g., Apple Corps v. Sony Music Entertainment*, 1993 U.S. Dist. LEXIS 9512, *16-17 (S.D.N.Y. July 14, 1993) (finding unsigned settlement agreement should be enforced).  Whether the parties intended to be bound absent a signed written agreement "is a question for the fact finder to decide." *Deutsche Asset Mgmt.*, 2004 U.S. Dist. LEXIS 5945, *52, citing *Consarc*, 996 F.2d at 576.  This is so "even in cases where the evidence strongly suggests that the parties *did not* intend to be bound absent a written agreement." *Deutsche Asset Mgmt.*, 2004 U.S. Dist. LEXIS 5945, *52.

Defendant ignores the above established legal principle and instead asks this Court to make fact findings now to support her claim that the parties did not intend to be bound absent execution of the Final Agreement.  For example, Defendant asks that the Court find that "industry practice" (a term that is undefined and that is, in any event, not a part of the Complaint) establishes an intent not to be bound.  (Def. Mem. at 13.)[3]

Similarly, Defendant asks that the Court read the Acceptance E-mail and infer therefrom that the parties did not intend to be bound absent execution of the Final Agreement.  (*Id*.)  Making such a factual determination on this Motion would be improper.  In any event, the Acceptance E-mail establishes beyond cavil the opposite of what Defendant claims – it undisputedly demonstrates that Defendant – through her representative – intended to be bound by the terms of the Final Agreement.  Specifically, in the Acceptance E-mail she stated:

> [t]he *final* revision of the above-referenced contract looks good.  Please send *signature copies* of the revised agreement to Betsy Lerner at Dunow Carlson & Lerner.  Could you please e-mail *a final clean copy to me for my file*?  Thanks so much.  *I can't believe we made it!*

(Cmplt. ¶ 13.)  (Emphasis Added.)

In support of the inexorable conclusion of a binding contract are the facts that Defendant's representative: (a) refers to the Final Agreement as "[t]he *final* version;" (b) asks for "*signature copies*" to be sent to another of Defendant's representatives; (c) asks for a "*final clean copy*" for her files; and (d) expresses relief at having completed the Agreement.  (*Id*.)  There is no reservation of a right not to be bound until the Final Agreement is signed.  Nor is there any reference to the Final Agreement being a "draft" or otherwise subject to Defendant's final approval.  Why would Defendant's representative request "signature copies" and refer to the Final Agreement as the "final version" if she did not believe that the parties had reached agreement and intended to be bound by the negotiated and agreed upon terms?

---

[3] Defendant concedes that she is seeking findings of fact on this motion:  (1) in discussing a factual determination in *Scheck v. Francis*, 26 N.Y.2d 466, 470, 311 N.Y.S.2d 841, 843 (1970), Defendant states "[t]he Court should make such a finding here" (Def. Mem. at 13); (2) Defendant further states "the *facts* here unquestionably demonstrate that Kensington understood that no binding agreement would arise without Ms. Armstrong's signature."  (*Id.*, emphasis added.)  Defendant's attempt to have the Court draw inferences favorable to her are contrary to law and should be rejected.

Moreover, even after she tried to withdraw from the Final Agreement, there is no evidence that Defendant ever alleged that any of the terms therein were not agreed to.  To the contrary, in speaking with Kensington, Defendant, and/or her representative, complained about the amount of time it had taken for the Final Agreement to be "finalized."  (Cmplt. ¶¶ 16-19.)

Defendant's argument that the fact that Kensington sent an unsigned Agreement to Defendant evidences an intention not to be bound without a signature is similarly not well taken. (Def. Mem. at 13.)  There could be any of a number of reasons for this including, for example, a desire to forward the Final Agreement to Defendant as soon as possible without the delay of obtaining a signature from an authorized signatory at Kensington.  Regardless of the reason, this also is an issue of fact not appropriately decided here.

Meanwhile, Defendant fails to disclose that the Second Circuit has established four factors to assist the fact finder in deciding whether parties intended to be bound in the absence of a formally executed document.  "These factors are: (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; (4) whether the agreement at issue is the type of contract that is usually committed to writing."  *Apple Corp*, 1993 U.S. Dist. LEXIS 9512, *16 (citations omitted).  All of the applicable factors favor Plaintiff.

**Express Reservation**

The first factor – whether there has been an express reservation of the right not to be bound – is considered the "most important" in the inquiry.  *Farago Adver., Inc. v. Hollinger Int'l, Inc.*, 157 F. Supp.2d 252, 259 (S.D.N.Y. 2001).  Indeed, in some cases, it has been found to be dispositive.  *Id.*

The record on this Motion is devoid of *any* express reservation not to be bound, absent a signature.  Neither the Acceptance E-mail nor the Final Agreement contains any such reservation.

**Partial Performance**

In reliance upon the Oral Agreement, Kensington began to perform by expending resources to develop Defendant's project.  (Cmplt. ¶ 10.)

**All Terms Agreed Upon**

It cannot be disputed from the record on this Motion that all of the material terms were agreed to by the parties.  Unlike most cases of this kind where the fact finder is required to piece together the terms of an agreement from multiple writings, in this case, *all* of the agreed upon terms were contained in the Final Agreement.  Moreover, neither in her multiple explanations for reneging on the Final Agreement (*id.* ¶¶ 15-19), nor on this Motion, has Defendant *ever* identified even a single provision in the Final Agreement to which she had not agreed.

**Agreement Usually Committed To Writing**

This factor cannot be determined on this Motion because there is no allegation in the Complaint concerning it.

In sum, all factors about which there is any evidence on this record, favor Plaintiff.

While it is Plaintiff's position that the above facts support *only* the conclusion that the parties intended to be bound by the Final Agreement, whether or not it was signed, any conclusion, one way or the other, requires the Court to make findings of fact and to draw inferences.  Of course, findings of fact on this Motion are inappropriate and, in any event, all inferences arising from the facts alleged in the Complaint must be drawn in favor of the Plaintiff.  *Swierkiewic*, 534 U.S. at 508 n.1.

> **2.** **Defendant's Attempt To Claim That The Agreement Upon Which She Relies Consists Solely Of The Acceptance E-mail Is Both Disingenuous And Incorrect.**

Defendant asserts that her Statute of Frauds defense should also prevail because Kensington refers "solely" to the Acceptance E-mail as the "signed note or memorandum" of the deal terms, which she says is insufficient to establish an enforceable agreement.  (Def. Mem. at 13.)  Defendant goes on to argue that the Acceptance E-mail is insufficient to establish an enforceable agreement because it does not spell out all of the material terms of the alleged agreement.  (*Id*. at 14.)  This argument is both disingenuous and ignores the law controlling this case.

As established above, "[a] written contract can be formed from *more than one writing*, including letters or memoranda signed by only one party or unsigned by only one party *or*

*unsigned by either party. Consarc, N.A.*, 996 F.2d at 572-573.  (Emphasis added.)  Such writings must be read *together* to determine whether an enforceable agreement exists.  *Commander Oil Corp.*, 991 F.2d at 52-53.

It is undisputed that Plaintiff relies upon the combination of the Acceptance E-mail *and* the Final Agreement to establish that the latter is binding.  Similarly, it cannot be disputed that the Final Agreement sets forth in great detail the terms agreed to by the parties, and thus fully satisfies the requirements of the Statute of Frauds.

## IV.   DEFENDANT'S CLAIM THAT PLAINTIFF IS NOT ENTITLED TO SPECIFIC PERFORMANCE IS INCORRECT.

Defendant seeks to strike so much of the Complaint that seeks specific performance as a remedy.  In so moving, Defendant does not deny that the books she is required to produce are "unique and extraordinary," prerequisites for the remedy of specific performance.  Instead, Defendant relies upon cases that hold that specific performance is not available as a remedy for breach of a contract for personal services.  (Def. Mem. at 16-18.)  Because the Agreements between Kensington and Defendant are not for personal services, the cases are inapposite.

All of the "personal services" cases upon which Defendant relies concern the provision of intangible services, generally in the employment context.  Specifically, Defendant's cases concern: (1) a sportscaster's ongoing services on a television broadcast (*American Broadcasting Cos. V. Wolf*); (2) a boxer fighting in exhibition (*Arias v. Solis*); (3) an attorney providing legal services (*Goldsmith v. Pyramid Communications, Inc.*); (4) a sales agent providing sales services (*Bethlehem Engineering Export Corp. v. Christie*); (5) a theatrical performer (*Shubert Theatrical Co. v. Rath*); (6) a singer (*Creator's Way Associated Labels, Inc. v. Mitchell*); and (7) an actor (*Lawrence v. Dixey*).  None of these cases involve a contract under which the individual providing personal services was required to deliver any tangible product.

In contrast, in this case, Defendant is under contract to deliver two books for publication.  This is no different from a carpenter being under contract to build a garage, a basket weaver under contract to deliver baskets, or a factory under contract to deliver widgets.  That writing a book results in "intellectual property" does not change the result.  If a contract for the delivery of books for publication is deemed to be a contract for "personal services," then the other examples

above also would qualify, thus making specific performance unavailable for virtually any contractual breach.  Defendant has provided *no case* to support her view here that a contract to produce a tangible product qualifies as a contract for "personal services."  As a result, Kensington's claim for specific performance of Defendant's obligation to deliver two books *is* available in this case.

Moreover, Defendant's obligation to deliver two books is not the sole covenants she made under the Final Agreement.  For example, paragraph 15 of the Final Agreement prevents her from publishing anything that is likely to injure the sale of any book prepared thereunder.  (Lerner Ex. at 15-16, ¶ 15.)  Similarly, paragraph 16 of the Final Agreement requires that Defendant provide Kensington with a refusal right over her next book.  (*Id*. at 16, ¶ 16.)  Even the cases upon which Defendant relies clearly hold that negative covenants such as this are enforceable, even if the contract is one for personal services.  *See, e.g.*, *American Broadcasting Cos. v. Wolf*, 52 N.Y.2d 394, 402, 438 N.Y.S.2d 482 (1981); *Shubert Theatrical Co. v. Rath*, 271 F. 827, 830 (2d Cir. 1921) (enjoining theatrical performers from performing for third party).

Because the Final Agreement is not a personal services contract and because negative covenants are enforceable in personal services contracts, Defendant's Motion to strike Plaintiff's request for specific performance should also be denied.

## V.   DEFENDANT CANNOT ESTABLISH AT THIS STAGE THAT PLAINTIFF WILL NOT BE ENTITLED TO ATTORNEYS' FEES.

Defendant relies upon the so-called "American rule" and argues that under no circumstances can Plaintiff be awarded attorneys' fees in this case.  (Def. Mem at 18-19.)  However, in a contract action "'a court may award fees pursuant to its inherent equitable authority when a party has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons.' *Kerin v. U.S. Postal Serv.*, 218 F.3d 185, 190 (2d Cir. 1990) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975))." *Westchester Fire In. co. v. Massamont Ins. Agency, Inc.*, 420 F. Supp.2d 223, 227 (S.D.N.Y. 2005).

In this case, Plaintiff has asserted a claim for breach of the implied covenant of good faith and fair dealing.  (Cmplt. ¶¶ 35-40.)  Such claims, by their very nature, assert bad faith against

the Defendant.  *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, Inc.*, 392 F.3d 520, 525 (2d Cir. 2004); *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 394-395 (2d Cir. 2005).

Defendant may not believe she acted in bad faith.  However, that is an issue for the fact finder to determine.  An allegation of bad faith is sufficient to sustain Plaintiff's claim for attorneys' fees.

## VI.   PLAINTIFF MAY BE ENTITLED TO PUNITIVE DAMAGES

As she does in arguing that Plaintiff is not entitled to attorneys' fees, Defendant relies upon a general rule that punitive damages are not "ordinarily" available as a remedy for breach of contract.  (Def. Mem. at 19-20.)  However, punitive damages *are* available when "there is an 'extraordinary showing of a disingenuous or dishonest failure to carry out a contract.'  *Gordon v. Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427, 437, 334 N.Y.S.2d 601, 285 N.E.2d 849 (1972), *cert. denied*, 410 U.S. 931, 35 L. Ed. 2d 593, 93 S. Ct. 1374 (1973)."  *Career Initiatives Corp. v. Palmer,* 893 F. Supp. 295, 296 (S.D.N.Y. 1995).

Whether a "showing of a disingenuous or dishonest failure to carry out a contract" is present here can only be fleshed out through discovery and then determined by the fact finder.  A determination of these facts at this stage is inappropriate.

**CONCLUSION**

For the reasons set forth above, Plaintiff respectfully requests that Defendant's Motion be denied.


Dated: September 22, 2006


PERKINS LAW OFFICE, P.C.


By: _____/Patrick T. Perkins/_____
            Patrick T. Perkins (PP 1694)
            1711 Route 9D
            Cold Spring, New York 10516
            Tel: (845) 265-2820
            Fax: (845) 265-2819